# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 19, 2006 Session

## STATE OF TENNESSEE v. THOMAS COBURN

### Appeal from the Criminal Court for Sullivan County
### No. S46,918-19     R. Jerry Beck, Judge

---

### No. E2005-02730-CCA-R3-CD - Filed August 9, 2007

---

The Defendant, Thomas Coburn, was convicted by a Sullivan County jury of aggravated kidnapping, a Class B felony, and attempted rape, a Class C felony. The trial court sentenced the Defendant to nineteen years for the aggravated kidnapping and nine years for the attempted rape to be served consecutively in the Department of Correction. On appeal, the Defendant asserts the following: (1) his conviction for aggravated kidnapping violated federal and state due process protections and should be vacated under State v. Anthony, 817 S.W.2d 299 (Tenn. 1991); (2) the evidence establishing identification is insufficient to support his convictions for attempted rape and aggravated kidnapping beyond a reasonable doubt; and (3) the trial court erred in ordering the Defendant to serve consecutive sentences based upon the classification as a dangerous offender. We reverse the Defendant's conviction for aggravated kidnapping. We affirm the conviction for attempted rape.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part

DAVID H. WELLES, J., delivered the opinion of the court. JAMES CURWOOD WITT, JR., J., filed a concurring opinion. JOSEPH M. TIPTON, P.J., filed a concurring and dissenting opinion.

Steven M. Wallace, District Public Defender; and Terry L. Jordan, Assistant Public Defender, Blountville, Tennessee, for the appellant, Thomas Coburn.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Greeley Wells, District Attorney General; and Joseph E. Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

This case arises from an attack upon a female jogger just after noon on June 5, 2002 on the Greenbelt exercise trail in Kingsport, Tennessee. The victim alleged that she was "completely taken off guard" when an assailant approached her from behind, covered her eyes, grabbed her breast, and "forcibly" pulled her "toward the brushes [sic]" that lined the paved trail. The victim wrestled with the assailant and was able to turn and face him, at which point she realized that the man was "wearing nothing but a blue ski mask, and a pair of tennis shoes." The victim also observed that her attacker was in a state of "semi-arousal."[1]

The victim struggled with the assailant for approximately "ten to twenty-five" seconds, during which time she used her car keys as a weapon "to punch and stab" the attacker. The victim "felt impact on several occasions," confirming that she was able to successfully strike the assailant. Throughout the struggle, the victim stated that the attacker attempted to move her "constantly back towards the brushy trail." As the victim fought the assailant, he continued his attempts to move her into the wooded area by "grab[bing her] hair and pull[ing her] head back." The victim stated that, during the fight, they "left the path at one point . . . ." Ultimately, the victim was able to successfully defend herself from the attacker. The masked assailant ran in one direction down the trail, and she sprinted away from him in the other direction. As the attacker ran away from her, the victim saw him "turn around . . . and make like he was going to come after [her] again," but the attacker eventually continued to run away.

Although the victim did not see anyone on the trail initially to whom she could report the attack, she eventually came upon two other female runners. The victim told them what had occurred, and one of them used a cellular phone to report the incident to the local law enforcement authorities. The victim stated that she never saw her attacker's face but was able to generally describe his height, build, and complexion for authorities. She testified that "he had relatively light skin, relatively fair skin, [and] very little body hair"; "small to medium build"; and was "approximately . . . five [feet], seven and three-quarter [ inches]" tall. She also reported that he was wearing a blue ski mask throughout the attack, preventing her from identifying his facial features. The victim did not hear the assailant's voice and testified that, during the attack, the attacker made only "growls." The victim testified that, as a result of the incident, she sustained a scratch on her cheek and on her finger[2] and that her "neck hurt for several days after the attack." Finally, the victim testified that she felt that the attack was sexual in nature because the man was naked and aroused, "forced [her] to be pressed tightly against his body," and "touch[ed] her breast."

---

[1] The victim specifically stated that the attacker either had a "fully erected to semi erect" penis. At another point during the trial, the victim colloquially stated that "the flag was raised."

[2] Photographs taken during the investigation were introduced showing a scratch on the victim's cheek and on the victim's finger.

One of the other female joggers—Leslie Taylor—also testified to what she witnessed that afternoon on the Greenbelt. She stated that she first realized something was out of the ordinary when she "heard a lady calling for help." Ms. Taylor ran to her car to retrieve her cellular phone to report the situation; the victim and Ms. Taylor's jogging partner walked behind Ms. Taylor. As Ms. Taylor was running to her car, she noticed a man, whom she identified in court as the Defendant, wearing "a pair of white and blue tennis shoes, a pair of soccer shorts . . . and a white shirt that had several buttons . . . in the front." She said the Defendant "was walking by very slowly; and he appeared to look over his shoulder to see what [they] were talking about, and just seemed very interested in what [they] were doing." Ms. Taylor also said that the Defendant was "just acting very weird and odd" and that "his head was very wet with sweat" but that his body and clothing were not. The man walked out of Ms. Taylor's sight and then returned twice, acting in the same manner—looking over his shoulder and seeming interested in what was transpiring. Ms. Taylor said that the victim was with her at this time, but the victim testified that she did not notice the man because she had her head down and was crying and preoccupied. Ms. Taylor testified that the man eventually left the area. On the following day, Ms. Taylor saw the Defendant's photograph in the newspaper and stated that she had "[n]o doubt whatsoever" that the photo was that of the man she saw acting suspiciously on the Greenbelt trail.

Once the victim reported the attack, Kingsport Police Department officers began searching for the attacker in the area around the Greenbelt trail. Initially, Detective David Cole reported to the Greenbelt, met with the victim, and asked her to show him where the attack occurred. Detective Cole testified that he "noticed the cut to her finger and . . . the mark next to her left eye" that she stated had occurred during the altercation. He stated that she described the attacker as having a "medium build . . . ." He also stated that she allowed him to use a "DNA collection kit" to take samples from her car keys, her hands, and her fingertips to determine if they contained "any possible evidence" to identify the attacker. Detective Cole also observed that the victim "was very upset, and shaken" while he talked to her about the incident.

Both Lieutenant Robert Abernathy and Captain Ed Swayze were also involved in the effort to catch the perpetrator almost immediately after the attack. Lieutenant Abernathy testified at trial that he was riding in Captain Swayze's patrol car when they heard a radio bulletin regarding the attack on the Greenbelt. Because they were "very close" to the location of the attack, they responded to the area where the suspect was reported to have fled, which was near Eastman Road and Kingsport Mall. They first proceeded to Reedy Creek Road but did not see a suspicious person in this area.

Captain Swayze and Lieutenant Abernathy then proceeded to the parking lot of the Kingsport Mall, which was a virtually abandoned shopping plaza, and they saw "a vehicle that was approaching" from the direction of the Greenbelt.[3] Lieutenant Abernathy described the vehicle as "a dull black colored Chevrolet, S-10 pickup. . . . [I]t was an extended cab pickup, one of the small ones. It had gray primer on the area that would have been immediately behind the driver's

---

[3] Not only is the Kingsport Mall close to the Greenbelt, but a trail leads directly from the mall parking lot to the Greenbelt. The access to the Greenbelt is only approximately 300 to 400 yards from the mall parking area.

compartment, the driver's door." They saw that the vehicle had no occupants other than the driver. Furthermore, Lieutenant Abernathy testified that he immediately noticed that "the person driving the vehicle did not look at [them]" and that "he was sweating . . . very heavily." The police officers radioed the license tag information to the central dispatchers and were given "additional information" that led them to radio the description of the truck to other officers and advise them that the truck was likely traveling north on Eastman Road toward Stone Drive. They also attempted to follow and locate the vehicle, which they had lost sight of by the time they received further information about the truck. When they did not observe the vehicle going east on Stone Drive, they notified other officers in the area that they believed the suspect was traveling west on Stone Drive.

Moments later, Officer Brian Carter observed a vehicle fitting the truck's description traveling west on Stone Drive as Lieutenant Abernathy and Captain Swayze had suspected. The truck was traveling approximately sixty miles per hour on a hilly and curvy road where the posted speed limit was twenty-five miles per hour. As Officer Carter followed the truck in his patrol car, the vehicle "sped up" until Officer Carter "activated [his] blue lights . . . ." At that time, the Defendant slowed down to approximately forty-five miles per hour, but the Defendant did not stop his vehicle. The driver passed several places where he could have pulled the truck over, but the driver did not do so even though Officer Carter noticed in the suspect's "driver's side mirror that he kept making [eye] contact." Ultimately, Officer Carter sounded the "air siren," and the Defendant then immediately stopped his vehicle.

Officer Carter approached the Defendant's vehicle and immediately noticed that "[h]e was perspiring very heavy [sic], [and] appeared very nervous." Officer Carter also observed "a little bit of blood on the back of his neck." When Officer Carter asked the Defendant about the bleeding, he replied that "he scratched a mosquito bite." Officer Carter then asked the Defendant to step outside of his vehicle. The Defendant was wearing "a light colored shirt, and a pair of soccer style shorts."[4] Officer Carter realized that the Defendant was not wearing any underwear underneath his shorts. Officer Carter notified Lieutenant Abernathy and Captain Swayze that he had apprehended a suspect, and they both proceeded to the location of the traffic stop.

Approximately two minutes after Officer Carter made the initial traffic stop, Captain Swayze and Lieutenant Abernathy arrived at the location of the stop. Lieutenant Abernathy testified that this truck was the same vehicle he had seen in the Kingsport Mall parking lot minutes earlier. Lieutenant Abernathy also believed the Defendant to be the same driver that he had observed when he initially saw the truck. Lieutenant Abernathy then proceeded to search the suspect's truck.[5] Under the driver's seat were "a pair of white shorts" and a magazine with photographs of "partially clad"

---

[4] Ms. Leslie Taylor, who happened upon the victim on the Greenbelt trail, testified that the clothing in which she saw the man on the trail matched the shirt, shorts, and shoes that the Defendant was wearing when he was apprehended. Ms. Taylor testified, however, that she never saw a blue ski mask.

[5] From the transcript of the motion to suppress hearing, we are able to glean that Lieutenant Abernathy initially asked the Defendant to consent to the search of his truck, which the Defendant refused. Later, Lieutenant Abernathy performed a search incident to the Defendant's arrest.

women. There was a t-shirt lying across the console between the front seats, and inside the console was a "[r]oyal blue toboggan style ski mask"[6] and a "camouflaged ski mask."

Lieutenant Abernathy also spoke with the suspect himself, at which point he noticed that "there was blood on the back collar area" of "the shirt that he was wearing[.]" Lieutenant Abernathy asked the suspect to remove his shirt "for evidentiary purposes" and then noticed that there was a scratch on the back of his neck and on the left side of his chest. Officer Carter testified that he also noticed these scratches when the suspect removed his shirt. Lieutenant Abernathy observed that there were no tears on the shirt in the locations of the suspect's scratches. Both Officer Carter and Lieutenant Abernathy denied that they were in any way forceful with the Defendant throughout the traffic stop and stated that, as such, they could not have caused scratches to the Defendant.

After the Defendant was placed under arrest, he was interviewed by Detective Cole, who originally met with the victim at the Greenbelt. Detective Cole photographed the scratches on the Defendant's body and took his tennis shoes as evidence. Detective Cole also used the DNA kit to swab the abrasions on the Defendant's body to compare to the samples taken from the victim's keys and fingertips.

The Defendant was then taken to Holston Valley Hospital, where he was examined by Dr. Michael L. Bacon. Dr. Bacon testified at the Defendant's trial as an expert in emergency medicine. Referring to the photographs of the two scratches on the Defendant's chest and neck, Dr. Bacon testified that he observed those injuries when the Defendant arrived at the hospital. Dr. Bacon testified that he is able to distinguish typical cuts and abrasions from insect bites and that the scratches on the Defendant's body were the former. Dr. Bacon further testified that the scratches occurred "within about six hours" before the examination because the "wound was not bleeding . . . but yet it [was] still fresh . . . [and] had not turned a dark color that wounds typically do about six to twelve hours out." With regard to how the wound occurred, Dr. Bacon stated that it did not in any way appear to be self-inflicted and also did not appear to be inflicted by fingernails; however, Dr. Bacon was unable to definitely state how the scratches occurred. Dr. Bacon also testified that the wounds were unique because "[m]ost scratches are a straight line. Rarely do you see a curve [as these wounds were]."

The evidence taken throughout the investigation was also sent to the Tennessee Bureau of Investigation crime laboratory. Special Agent Forensic Scientist Donna Nelson testified at trial as a serology and DNA expert regarding the analysis of the evidence in this case. Special Agent Nelson testified that the analysis of the DNA swabs from the victim's keys and fingertips were negative for human blood. Special Agent Nelson also stated that the victim's pants, which Detective Cole obtained some time after the incident, were negative for seminal fluid. Because Special Agent Nelson was unable to find any fluids to compare to the Defendant's known DNA sample, the laboratory could not provide any serology evidence to either implicate or exonerate the Defendant.

---

[6] The victim later identified the blue ski mask as matching the mask worn by her attacker.

The Defendant testified on his own behalf and denied that he had any part in the attack on the Greenbelt. He claimed that he was at the Greenbelt to meet his friend, Michael Holt, to go bicycling. He stated that they had made plans to meet at noon and that he had called his friend earlier that morning to verify that they were meeting but that Mr. Holt was not home at that time. He stated that he parked at the Kingsport Mall, where many people park to access the Greenbelt, but walked to the area where Ms. Taylor saw him because he wanted to be in the shade on the hot summer day while he was waiting on his friend. He stated that he did walk between 150 and 200 yards from his truck but claimed that his truck was visible to him through the wooded area so he could see when Mr. Holt arrived. He admitted seeing "a group of people" and noticing "a person obviously crying." He stated that he was sweating from the heat of the day and that his shirt was wet from perspiration even though Ms. Taylor testified that she believed only his head was wet. He said he waited between twenty-five and thirty minutes for Mr. Holt but then left the Greenbelt to go to Mr. Holt's home to see why he did not meet him.

The Defendant testified that his home and Mr. Holt's home were close to Idlehour Road, which was the road he was traveling on when he was apprehended by authorities. He testified that he did not pull over immediately because he thought the officer simply wanted to get around his vehicle and that there were no areas to pull over on such a narrow road. He said he did not realize that he was breaking any laws and that he knew he did not speed up going over the hills on Idlehour Road because "[t]he particular vehicle [he] was driving was a five speed, four cylinder vehicle . . . [that] would [not] go that speed up the hill . . . ." He testified that he realized the officer wanted him to pull over when he sounded his air siren, at which point he pulled to the side of the road. He explained that he had the blue ski mask and the camouflaged ski mask in his truck because these were his and Mr. Holt's hunting masks, respectively. He testified that he kept the masks in his car to prevent getting his scent on the masks. He also stated that he was still sweating because his "vehicle does not have an air conditioner," and this was a hot summer day.

He also stated that the only reason he could have received scratches on his neck and chest was because the officers used physical force throughout the traffic stop. He stated that Officer Carter forcefully pulled him out of the truck and pushed him "against the side of [the] truck" when he was initially stopped. He testified that Officer Carter also forcibly pulled him backwards when Lieutenant Abernathy stated he could search the truck because it was being "confiscat[ed]." He stated that Lieutenant Abernathy also forcefully pushed him into the patrol car upon being arrested and that he forcibly removed his shirt and one tennis shoe[7] for evidentiary purposes. He stated that he could not pinpoint exactly what caused the two scratches but that he felt pain on several different occasions when the officers used force against him. He testified that he never told any officers or his doctor that he had scratched a mosquito bite that had led to bleeding, although the officer listed this as the complaint at the hospital.

---

[7] Lieutenant Abernathy testified that he did not remove the Defendant's shoe at the scene of the traffic stop. Furthermore, Detective Cole testified that he removed the Defendant's shoe at the Kingsport Police Station after the Defendant had been arrested.

Michael Holt also testified for the defense and stated that he was running late in meeting the Defendant, who was his "best friend[,]" at the Greenbelt at noon. He stated that he and the Defendant routinely went to that area for exercise and recreation, such as bicycling and fishing. He stated that he "knew" that the Defendant would wait on him at the Greenbelt. He also stated that the Defendant used the blue ski mask for hunting[8] and that the camouflaged ski mask found in the Defendant's vehicle was his own hunting mask, not the Defendant's. He stated that they kept the masks in the Defendant's vehicle to avoid getting "human scents" on the hunting apparel. When asked if he would "lie for [his] best friend[,]" Mr. Holt responded, "not if . . . he done it."

### Procedural Background

The Defendant was charged by presentment from a Sullivan County grand jury with attempted rape and aggravated kidnapping.[9] The Defendant filed a motion to suppress all evidence discovered in the traffic stop, asserting that he was "unlawfully seized and arrested" and that "law enforcement officers [were] without reasonable suspicion or probable cause" when they initiated the traffic stop. The trial court denied the motion.

After a jury trial, the Defendant was convicted of attempted rape and aggravated kidnapping. The trial court initially sentenced the Defendant as a violent offender to serve twenty years for the aggravated kidnapping and ten years for the attempted rape to be served consecutively in the Department of Correction. The Defendant timely filed a motion for a new trial, which was subsequently amended twice. The final motion for a new trial alleged, among other issues, that the evidence was insufficient to support the Defendant's convictions, that the trial court erred in ordering the Defendant's sentences to be served consecutively, and that the trial court "erred in not merging the aggravated kidnapping conviction with the attempted rape conviction, or the alternative, in not merging the attempted rape conviction with the aggravated kidnapping conviction."[10]

The trial court denied the Defendant's motion for a new trial. First, with regard to the Anthony due process issue, the trial court found that "when a man is naked in a pair of tennis shoes and a blue ski mask and grabs a young woman from behind and begins pulling her toward the bushes and he has a semi-erection, it would seem the Jury could certainly imply that kidnapping, what have you, to get her out of sight, out of that public sun-shining area over into the bushes." The trial court

---

[8] The Defendant explained that, even though most hunters admittedly used a camouflaged mask, he did not feel the need to do so because "the deer . . . are color blind."

[9] The Defendant was also charged, in a separate presentment, with speeding and a fourth offense of driving on a suspended license.

[10] We note at the outset that, although the Defendant phrased the issue in his motion for a new trial and in his appellate brief as whether the convictions should be merged, the remedy for due process violations under State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), is dismissal of the kidnapping conviction. See State v. Antonio D. Richardson, No. M2005-01161-CCA-R3CD, 2006 WL 1173168, at *7-8 (Tenn. Crim. App., Nashville, May 4, 2006), reh'g denied, (Sept. 7, 2006), perm. to appeal granted (Tenn. Jan. 29, 2007).

found that the victim was "certainly . . . once he grabbed her, she was headed in that direction, in the bushes." The trial judge stated that he "is of the opinion that, particularly, the risk of detection [factor which is relevant to the Anthony-Dixon analysis] . . . he was getting her over there [and into the bushes and off the path] so he could rape her."

Next, the trial court ruled that the evidence was sufficient to support the Defendant's convictions.[11] Finally, the trial court determined that the Defendant "presents himself before the Court as an extremely dangerous offender" and that "the interest and safety of the public . . . demands and commands that the Defendant receives consecutive sentencing." However, the trial court amended the judgments following the re-sentencing hearing and ordered the Defendant to serve nineteen years for the aggravated kidnapping and nine years for the attempted rape to be served consecutively in the Department of Correction. This appeal followed.

## Analysis
## I. Due Process

First, the Defendant asserts that his convictions for aggravated kidnapping and attempted rape violate the due process protections of the federal and state constitutions. This claim is founded upon our supreme court's decision in State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). In Anthony, the court analyzed "the propriety of a kidnapping conviction where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape." Id. at 300. The court observed that every robbery or rape involved some detention against the will of the victim but that this did "not mean that the legislature intended that every robbery [or rape] should also constitute a kidnapping, even though a literal reading of the statute might suggest otherwise." Id. at 306. The court held that such dual convictions must be analyzed based upon "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction." Id. at 300. Our supreme court suggested that "one method of resolving this question is to ask whether the defendant's conduct 'substantially increased [the] risk of harm over and above that necessarily present in the [accompanying] crime . . . itself.'" Id. at 306 (quoting State v Rollins, 605 S.W.2d 828, 830 (Tenn. Crim. App. 1980)).

In State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), our supreme court "refined the Anthony test" by "provid[ing] the structure necessary for applying the principles announced in Anthony." State v. Fuller, 172 S.W.3d 533, 536 (Tenn. 2005). Specifically, the Dixon court stated as follows:

---

[11] The trial court referenced evidence regarding sightings of the Defendant's black truck on other occasions as providing support for the conclusion that the identification evidence was sufficient. This evidence was not introduced before the jury but instead was only presented in the motion to suppress hearing and was improper for the trial judge to consider in a sufficiency review. However, this Court's analysis of whether the evidence was sufficient to support the Defendant's convictions beyond a reasonable doubt depends not upon the trial judge's conclusion but upon a determination of whether any rational trier of fact could have found the Defendant guilty from the evidence adduced at trial. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

> *Anthony* and its progeny . . . are not meant to provide the rapist a free kidnapping merely because he also committed a rape. The *Anthony* decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape . . . . Accordingly, any restraint in addition to that which is necessary to consummate rape . . . may support a separate conviction for kidnapping.

*Dixon*, 957 S.W.2d at 534-35 (footnote omitted).

Thus, the *Dixon* court refined and expanded the test to determine if dual convictions passed constitutional muster under *Anthony*. First, a reviewing court must decide "whether the movement or confinement was beyond that necessary to consummate the [accompanying felony]." Id. at 535 (citing *Anthony*, 817 S.W.2d at 306). To make this determination, the court stated that "it is the purpose of the removal or confinement and not the distance or duration that supplies a necessary element of [any degree of] kidnapping." Id. at 535; see *State v. Antonio D. Richardson*, No. M2005-01161-CCA-R3-CD, 2006 WL 1173168, (Tenn. Crim. App., Nashville, May 4, 2006), reh'g denied, (Sept. 7, 2006), perm. to appeal granted (Tenn. Jan. 29, 2007). If this initial question is answered in the affirmative, "the next inquiry is whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." *Dixon*, 957 S.W.2d at 535 (citing *Anthony*, 817 S.W.2d at 306).

When an appellate court reviews dual convictions under the "*Anthony*-*Dixon* regimen," see *Richardson*, 2006 WL 1173168, at *3, "[t]he issue of whether a separate kidnapping conviction violates [principles of] due process is purely a question of law[,]" *Fuller*, 172 S.W.3d at 536. An appellate court must "review questions of law de novo with no presumption of correctness afforded to the lower court's conclusions." Id. If the appellate court finds a due process violation occurred, the proper remedy is dismissal of the kidnapping conviction. See *Richardson*, 2006 WL 1173168, at *7-8.

We begin by noting that the *Anthony*-*Dixon* rubric does not provide a litmus test for clearly determining when dual convictions are unconstitutional. As we have previously stated, "[t]he contours of due process seldom are sharply defined." *Richardson*, 2006 WL 1173168 (order on petition to rehear). The present case is no exception.

### a) Whether the movement or confinement of the victim exceeded that necessary to consummate the attempted rape

Our first step in the analysis is to determine whether the "confinement, movement, or detention is essentially incidental" to the attempted rape. Although the trial court did not methodically discuss the factors of the *Dixon* test, the trial court did implicitly find that the movement was beyond that necessary to consummate the rape. The trial court stated that the offense of kidnapping was based upon the Defendant's attempts to "get [the victim] out of sight,

out of that public sun-shining area over into the bushes." We conclude that the trial court erred in determining that the convictions did not violate due process based upon the Defendant's actions.

When the entire attack lasts only "ten to twenty-five" seconds and consists of only a brief struggle between the victim and the attacker, the determination of whether excess "confinement, movement or detention" occurred is difficult. However, our supreme court stated in <u>Dixon</u> that "it is the purpose of the removal or confinement and not the distance or duration that supplies a necessary element of [any degree of] kidnapping." 957 S.W.2d at 535. As such, the fact that this struggle was brief and involved minimal movement does not necessarily require the conclusion that the convictions violate due process. Instead, the first prong of the due process inquiry turns on the Defendant's "purpose" for the removal or confinement.

The Defendant's purpose is likewise difficult to ascertain. While upon first consideration it may appear evident that the Defendant had a sexual purpose based upon the fact that he attacked the victim in the nude and in a state of "semi-arousal," the victim's own testimony focused on being pulled and pushed "constantly" toward the direction of the foliage around the exercise trail. Because the crime was apparently not carried to completion due to the victim's successful self-defense, the inquiry becomes murky at best. Because the victim courageously fought off her assailant, the attacker was scarcely able to remove the victim from the path at all and was able to restrain her for only thirty seconds or less.

For the purposes of due process, our supreme court has stated that the Defendant must employ "some restraint in addition to that which is necessary to consummate rape" in order to support a kidnapping conviction. <u>Dixon</u>, 957 S.W.2d at 534-35. Even though the Defendant, if not repelled by the victim, may have ultimately acted in a manner that would clearly evidence his intent to commit both a rape and a distinct kidnapping, we cannot conclude from the facts of this case that he did more than that which was necessary to attempt to subdue the victim in order to commit rape. Unlike the facts of <u>Dixon</u>, where the victim was moved thirty to forty yards from a public road to a secluded area, the Defendant in this case did not clearly evidence a separate purpose and intent to kidnap the victim. Therefore, we must conclude that the struggle and resulting detention was "essentially incidental" to the attempt to rape. Thus, we are constrained to determine that the convictions for both aggravated kidnapping and attempted rape violate the due process principles set forth by our supreme court in <u>Anthony</u>, <u>Dixon</u>, and their progeny.

Based upon our resolution of the initial analysis, we need not go further. See <u>Dixon</u>, 957 S.W.2d at 535. However, we will also address the remaining <u>Dixon</u> factors to facilitate possible further appellate review.

**b)  Whether the movement or confinement prevented the victim from summoning help, lessened the Defendant's risk of detection, or created a significant danger or risk of harm**

### 1) Preventing the victim from summoning help

The first question in the second prong of the <u>Anthony</u>-<u>Dixon</u> analysis is whether the Defendant's actions "prevented the victim from summoning help." The trial court did not rely upon this factor in determining that the Defendant's convictions did not violate due process. We agree that this factor is not present in the Defendant's case.

The record shows that the victim and the Defendant struggled on the running path or just off the running path. The Defendant did not successfully remove the victim from the area on which another passer by would travel. The victim also testified that she was able to scream throughout the attack and yelled at the Defendant even after the struggle was over. Thus, the Defendant did not prevent the victim from summoning help, even though no other runners happened to pass through this area at the time of the attack.

### 2) Lessening the Defendant's risk of detection

The next question is whether the Defendant succeeded in lessening his own "risk of detection." The trial court found that the Defendant did lessen his risk of detection by the method used to attack the victim. We agree with the trial court and conclude that Defendant's intention to escape detection is very clear. The Defendant's choice to attack a runner on a secluded trail at a time when he could see no other runners nearby demonstrates that he intended to lessen his risk of detection. Furthermore, not only did the Defendant choose a location where his detection was less likely, but he continued throughout the attack to attempt to move the victim into the nearby foliage, which would have exponentially lessened his risk of detection. Although the Defendant intended to lessen his risk of detection by forcing the victim into a heavily wooded area where a passer by would not see the attack, the victim was able to thwart the Defendant's plan.

### 3) Creating a significant danger or risk of harm to the victim

Finally, we must determine whether the Defendant's confinement or movement of the victim "created a significant danger or increased the victim's risk of harm." The trial court did not rely on this factor in its determination, and we conclude that this was proper.

In this case, the Defendant's actions did not create a danger or risk of harm beyond that already associated with the attempted rape itself. The confinement that the Defendant actually accomplished did not create a further and independent threat of danger or harm.

Based on the foregoing analysis, we must conclude that the Defendant's dual convictions for aggravated kidnapping and attempted rape violate the Defendant's due process protections. The remedy for such dual convictions in violation of the state and federal due process protections is the dismissal of the kidnapping conviction. As such, we must reverse and vacate the Defendant's conviction for aggravated kidnapping. We dismiss that charge.

## II. Sufficiency of the Evidence

Next, the Defendant asserts that the evidence of his identity as the perpetrator was insufficient to support his convictions for aggravated kidnapping and attempted rape beyond a reasonable doubt. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

We begin by analyzing the Defendant's challenge—that the evidence of his identification was insufficient for him to be convicted beyond a reasonable doubt. The identification of a perpetrator is a question of fact for the jury. State v. Vaughn, 29 S.W.3d 33, 40 (Tenn. Crim. App. 1998). Throughout the altercation, the assailant wore a blue ski mask that prevented visual identification of his facial features. The assailant also did not speak during the attack. However, there is substantial circumstantial evidence to prove that the Defendant committed the crime. The Defendant was apprehended with a blue ski mask in his truck which the victim identified as being the one her attacker was wearing. The Defendant was also seen by Ms. Leslie Taylor walking near the area where the victim was crying after the attack. Ms. Taylor stated that the man was sweating but that his shirt was not wet, leading to the possible inference that the man had recently put on fresh clothing. Furthermore, Lieutenant Abernathy and Captain Swayze saw the Defendant driving through the Kingsport Mall parking lot and also observed that he was sweating and would not make eye contact with them.

Eventually, the Defendant was spotted driving nearby more than twice the speed limit on a road with numerous curves and hills. The Defendant initially did not stop for Officer Carter but

continued to drive until Officer Carter activated his air siren. When he was finally stopped, he had a bleeding scratch on the back of his neck and a scratch on his chest. Although the Defendant stated that the bleeding was from scratching a mosquito bite, his treating physician testified that he had no insect wound and that the scratch did not appear to be self-inflicted. Officer Carter also testified that he was certain the Defendant was not wearing any underwear under his shorts when he was apprehended. Lieutenant Abernathy also found a magazine with photographs of partially clad women in the Defendant's vehicle, which the State argued supported the theory that the Defendant had been involved in a sexual crime. We conclude that the evidence is sufficient for a rational jury to find him guilty beyond a reasonable doubt of both attempted rape and aggravated kidnapping. Although the Defendant presented his version of events on the Greenbelt and explained that he was merely at the exercise trail to meet a friend, the jury simply did not accredit the defense.

Although the Defendant primarily challenges only the identifying evidence, we will also briefly review the overall sufficiency of the evidence. We conclude that a rational jury could find the Defendant guilty of both attempted rape and aggravated kidnapping beyond a reasonable doubt. The offense of rape requires the "unlawful sexual penetration of a victim by the defendant . . . accompanied by . . . force or coercion." Id. § 39-13-503(a). Attempt requires that the Defendant "[a]cts with the intent [otherwise required for the offense] to complete a course of action or cause a result that would constitute the offense . . . and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(b).

When the State is given the "strongest legitimate view" of the evidence, we observe that the Defendant approached the victim from behind, startled her, and attempted for ten to twenty-five seconds to subdue her. The Defendant was naked with the exception of his tennis shoes and his blue ski mask. The Defendant was also in a state of "semi-arousal," which the victim described as meaning that his penis was "fully erected to semi erect[.]" Certainly this struggle, during which the victim described that the Defendant touched her breast and pressed his body against hers, constituted a substantial step toward the offense of rape. Based upon this evidence, we conclude that the evidence is sufficient to support the conviction for attempted rape beyond a reasonable doubt.

Likewise, the offense of aggravated kidnapping is defined as "knowingly remov[ing] or confin[ing] another unlawfully so as to interfere substantially with the other's liberty" and the victim "suffers bodily injury." Tenn. Code Ann. § 39-13-302(a), -304. In the instant case, the evidence adduced at trial demonstrated that the assailant wrestled with the victim for "ten to twenty-five" seconds and scratched the victim's face and finger during the altercation. Although the victim was eventually able to break free, she was confined for what she stated "felt like the longest time of [her] life." The Defendant confined the victim for "ten to twenty-five" seconds against her will. This is sufficient evidence for a rational jury to determine that the Defendant was guilty beyond a reasonable doubt of aggravated kidnapping.

## III. Sentencing

Finally, the Defendant asserts that the trial court erred by imposing consecutive sentences. Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b)[12]; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W. 2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

"Whether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. James, 688 S.W.2d 463, 465 (1984). Under Tennessee Code Annotated section 40-35-115, the trial court "may order sentences to run consecutively if the court finds by a preponderance of the evidence that" the "defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-

---

[12] We note that the legislature has amended several provisions of the Criminal Sentencing Reform Act of 1989, said changes becoming effective June 7, 2005. However, the Defendant's crime in this case occurred prior to June 7, 2005, and the Defendant did not elect to be sentenced under the provisions of the Act by executing a waiver of his ex post facto protections. See 2005 Tenn. Pub. Acts ch. 353, § 18. Therefore, this case is not affected by the 2005 amendments, and the statutes cited in this opinion are those that were in effect at the time the instant crimes were committed.

115(b)(4). Additionally, the trial court must determine that consecutive sentences are "necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). Consecutive sentencing must also follow the general sentencing principles, requiring that the overall sentence "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. § 40-35-103. The trial court must "specifically recite the reasons" on the record for ordering consecutive sentences. Tenn. R. Crim. P. 32(c)(1).

In the present case, the trial court found in the initial sentencing hearing that the Defendant qualified as a dangerous offender:

> [I]s the defendant a dangerous offender whose behavior indicates little or no regard for human life[?] The answer to that can only be yes under anybody's logic. . . .

> Considering the circumstances of how this crime occurred, particularly where it occurred, in a well used Greenbelt area, considering that he had obviously planned it, he had to get naked somewhere. The evidence, he drove there in an automobile, he got naked, got aroused and went after her. So he is clearly a dangerous offender whose behavior indicates little or no regard for human life and he has no hesitation. Certainly on the Greenbelt you don't show much hesitation about committing a crime in which the risk to human life is high. . . . [J]ust laying out these facts I can't imagine anything worse.

In the re-sentencing hearing, which was held to review the sentence on other grounds,[13] the trial court reiterated that "consecutive sentencing is necessary" because "he presents himself before the Court as an extremely dangerous offender; that the interest and safety of the public, as set out in State v. Wilkerson demands and commands that the Defendant receives consecutive sentencing[.]"

The Defendant argues that the trial court did not make the necessary findings on the record regarding his dangerous offender classification under Tennessee Code Annotated section 40-35-155(b)(4) and the necessity to protect the public under Wilkerson. The Defendant further argues that he does not fall within these categories and thus consecutive sentencing is improper. The State asserts that the trial court properly imposed consecutive sentences.

---

[13] The re-sentencing hearing was held to address issues stemming from Blakely v. Washington, 542 U.S. 296 (2004).

The evidence in the record supports the trial court's finding that the Defendant is a dangerous offender. The trial court determined that the Defendant's actions merited consecutive sentences because he brazenly attacked a woman on a public jogging trail during the middle of the day. We have previously upheld consecutive sentencing in similar cases where the attackers perpetuated their attacks upon unsuspecting citizens in broad daylight. See State v. Norris Ray, No. W2004-01247-CCA-R3-CD, 2005 WL 1541785, at *8 (Tenn. Crim. App., Jackson, Dec. 5, 2005). We have also concluded that the victim need not be seriously injured during the crime to justify classifying the attacker as a dangerous offender. See Ray, 2005 WL 1541785, at *10 (noting that there was no "assistance on the [d]efendant's part" to prevent harm and that the victim may well have been harmed if it were not for his own actions). Additionally, the trial court stated its findings on the record, as required under our sentencing scheme.

We also note that the trial court found that the Defendant was eligible for consecutive sentences based upon his extensive criminal record. This finding was based upon evidence introduced at the initial sentencing hearing that the Defendant had eleven prior burglary convictions from the State of Oklahoma. In this appeal, the Defendant does not take issue with this finding. Under our sentencing law, the "court may order sentences to run consecutively if the court finds by a preponderance of the evidence that" the "defendant is an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(2). This factor has been interpreted to include not only the convictions presently before the sentencing court but also prior offenses. See State v. Palmer, 10 S.W.3d 638, 647-49 (Tenn. Crim. App. 1999). We conclude that the trial court properly found that the Defendant is eligible for consecutive sentencing based upon his extensive criminal record.

Therefore, we conclude that the trial court did not err by ordering consecutive sentences based on its finding that the Defendant is a dangerous offender and an offender with an extensive criminal record.

**Conclusion**

Based upon the foregoing authorities and reasoning, we reverse and vacate the Defendant's conviction for aggravated kidnapping and dismiss that charge. We affirm the judgment of the trial court finding the Defendant guilty of attempted rape.

_____
DAVID H. WELLES, JUDGE